IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 8, 2000 Session

## STATE OF TENNESSEE v. DAVID JOHNSON

**Appeal from the Criminal Court for Shelby County**
**Nos. 96-13580 & 97-08355     Chris Craft, Judge**

---

**No. W1998-00687-CCA-R3-CD - Filed March 14, 2001**

---

The defendant appeals from his Shelby County Criminal Court conviction and sentence for second degree murder. The trial court sentenced the defendant to 37 years in the Department of Correction as a Range II multiple offender. In this direct appeal, the defendant complains that the evidence is insufficient; that double jeopardy barred his retrial following the grant of a mistrial; that *Jencks* Act material, police reports, and arrest histories of state witnesses were improperly withheld; that he was not allowed to impeach a key witness in violation of his confrontation rights; that the trial court erred in ruling that his prior convictions could be used to impeach him if he testified; that the jury was improperly instructed; and that his sentence is excessive. We are unpersuaded that reversible error occurred and therefore affirm the judgment and sentence of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Michael E. Scholl, Memphis, Tennessee (on appeal); A.C. Wharton, Jr., District Public Defender; Phyllis Aluko, Assistant Public Defender; and Gwendolyn Rooks, Assistant Public Defender (at trial), for the appellant, David Johnson.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Jerry Kitchen, Assistant District Attorney General; and Julie Mosley, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, David Johnson, appeals as of right from his Shelby County conviction for second degree murder. *See* Tenn. Code Ann. § 39-13-210 (1997). The defendant's first trial on the charged offense of second degree murder was terminated before verdict when the jury was exposed to improper and harmful statements by prosecution counsel. The mistrial was followed by

the defendant's reindictment on charges of premeditated first degree murder and felony murder. At the conclusion of the second trial, the jury found the defendant guilty of the lesser-included offense of second degree murder. The trial court sentenced the defendant as a Range II multiple offender to 37 years confinement in the Department of Correction. In this appeal, the defendant presents the following issues for our consideration:

1. Whether the trial court erred in denying the defendant's pretrial request for *Jencks* Act material.

2. Whether the trial court erred by not requiring the state to produce police reports as being potentially exculpatory material.

3. Whether the trial court erred in not requiring the state to produce the arrest histories of its witnesses.

4. Whether the trial court erred by allowing all of the defendant's convictions to be available for impeachment if the defendant were to testify.

5. Whether double jeopardy barred the retrial of the defendant when his first trial was terminated, without a verdict, because of the harmfully prejudicial questioning of a witness for the state.

6. Whether the trial court erred in allowing the state, after the mistrial was declared, to retry the defendant on a superseding indictment alleging more serious offenses.

7. Whether the trial court erred by refusing to grant the defendant's motion to exclude the jury instruction charged pursuant to T.C.A. § 40-35-201(b)(2).

8. Whether the trial court erred in refusing to allow impeachment of witness Mary Payne concerning the dismissal, prior to the defendant's trial, of her probation violation charge.

9. Whether the trial court erred by not granting a motion for directed verdict and judgment of acquittal after the state's proof and at the end of the trial.

10. Whether the court erred in sentencing the defendant to 37 years in the Tennessee Department of Correction.

After a thorough review of the record, the briefs of the parties, and the applicable law, we affirm the trial court's judgment and sentence.

The events that form the basis for the defendant's prosecution and conviction unfolded in the late summer of 1996. On the evening of September 21, at approximately 10:30 p.m., David Payne was shot in the back at point-blank range outside his sister's home. He died shortly thereafter from blood loss occasioned by the shooting.

The victim's sister, Mattie Pope, lived at 929 North Seventh Avenue in Memphis, Tennessee. The victim often visited with her on the weekends, and the weekend of September 21 was no exception. Several other people also were visiting that day. Shortly before the shooting, Ms. Pope and her guests were outside her home, some standing and others sitting in chairs on the front porch. The victim had decided it was time to leave, and he walked to his car that was parked in the driveway along the side of the house. As the victim prepared to unlock the car door, a man appeared and walked up to the victim on the driver's side of the car. Words were exchanged between the victim and the man. The victim then turned to leave, at which point the other man discharged a firearm into the victim's back. The victim managed to walk up to the porch and inside the house before collapsing in the bathroom floor and dying.

Ms. Pope could not identify the person who killed her brother. The only description she could provide was that the shooter was a black male of medium height with a jherri curl who was wearing dark clothing. The only part of the exchange between the victim and the shooter that she heard was the victim's remark that he "didn't have any."

Of those present at Ms. Pope's house when the shooting occurred, the only other person who testified for the state was Mary Payne, the victim's niece. Ms. Payne was the sole prosecution witness who could identify the defendant as the individual who killed the victim. The state did not produce or introduce the firearm used to commit the murder, and no other physical evidence connected the defendant to the murder.

Mary Payne testified that, when the shooting occurred, she was standing on the porch about thirteen or fourteen feet from the victim's automobile. Fifteen to twenty minutes earlier, she had smoked crack cocaine. She testified that a man, known to her by the street name "Milk,"[1] walked from behind a tree and up next to the victim's car. Mary Payne said that she overheard "Milk" instruct the victim "to give him the money." The victim answered that he did not have any money on him, whereupon "Milk" retorted, "Well, don't move then goddamn it." When the victim turned and tried to walk away from the car, "Milk" shot him in the back. After "Milk" fired the shot, Mary Payne saw him as he walked off and down the street with a pistol in his right hand. At trial, Mary Payne identified the defendant as the person she knew as "Milk" and whom she had known for four or five years.

---

[1] Evidently, the moniker "Milk" related to a tatoo of a milk bottle on the man's arm.

The defense launched a vigorous attack on the credibility of this crucial witness, which included forays into her crack cocaine addiction, her prior convictions for attempted aggravated assault, forgery, possession of cocaine with intent to sell, prostitution, and her impersonation of her sister, Carolyn Pope. The impersonation came about when the police questioned her in connection with the victim's shooting; because there were warrants outstanding for her arrest, Mary Payne misrepresented her real identity to the police.

During cross examination, the defense also attempted to establish that when questioned by the police, Mary Payne identified the shooter as "the dude" who shot her uncle and not the individual known to her as "Milk." To that end, the defense treated the written account of Carolyn Pope a/k/a Mary Payne, which she gave to the police, as a prior inconsistent statement. Also recognizing the crucial importance of Mary Payne to its case, the state inquired about the prior statement further on redirect examination. The trial court declared a mistrial when the following transpired:

Q. And did [the police] ask you, did you see who shot the victim?

A. Yes, ma'am.

Q. And did you answer, yes, sir. It was a guy named Milk?

A. Yes, ma'am.

Q. And did they ask you is Milk the subject's real name or is it his nickname?

A. Yes, ma'am.

Q. And did you answer that is his nickname?

A. Yes, ma'am.

. . .

Q. And did they ask you, do you know the suspect?

A. Yes, ma'am.

Q. And did you answer, he lives in the neighborhood, and he just got out of jail. He is always going around and robbing people?

A. Yes, ma'am.

-4-

MR. JOHNSON: Your Honor, may I approach the bench?

Approximately one month after the mistrial, the grand jury returned a new indictment against the defendant in connection with David Payne's death. The new indictment charged premeditated first degree murder and felony murder, as contrasted with the original indictment's charge of second degree murder.

The second trial began in January 1998. Mattie Pope and Mary Payne again testified. The passage in Mary Payne's statement that had occasioned the mistrial was not introduced. As part of the second trial, the state presented the testimony of forensic pathologist, Thomas Deering, that the cause of death was blood loss from the single gunshot wound. In addition, crime scene officer, Sergeant Jimmy L. Daniels, and arresting officer, Patrol Officer John Guinn, testified about their roles in the case and identified various crime scene photographs; no direct evidence of the defendant's guilt resulted from their testimony.

Also as part of the second trial, the state offered the testimony of Angela Hull. She had not been called as a witness before the first trial ended in a mistrial. Her testimony, like that of Mary Payne, was key to establishing the identity of the person who murdered the victim. Angela Hull testified that she learned of the shooting shortly after it happened. She was in the neighborhood that evening, and she knew the victim and Mary Payne. When Angela Hull came upon the homicide scene, she inquired what had happened. She was told that "Milk" had shot the victim. She testified that several hours later, between 2:15 and 2:30 a.m., she encountered the defendant, who was known to her as "Milk," over in Scutterfield.

According to Angela Hull, upon seeing "Milk" she immediately confronted him, "Milk, I just heard you just killed somebody." The defendant at first denied any involvement, but Angela Hull testified that when she persisted, the defendant looked at her and said, "Yes, I killed the man because he raped and killed my sister in 1986." Thereafter, over the course of the next few hours, Angela Hull went back to the homicide scene, encountered the defendant a second time on Thomas Street where he solicited her to get high with him, went with him to a friend's house on Thomas Street, and finally got word to a next door-neighbor to call 911 and report that she had the "suspect." The police responded to the call, and the defendant surrendered without incident.

Angela Hull testified that she was not "high" when she first encountered the defendant. She did, however, have a history of drug use that included at least three prior convictions for possession with intent to distribute. She said that she knew of the defendant's sister "when we worked the streets," and she said that she knew the sister had died in 1986 of a drug overdose. At trial, she related that based on that knowledge, it made no sense to her when the defendant told her that the victim had raped and killed the sister some ten years earlier. Angela Hull testified that she had no reason to dislike "Milk" or lie about him.

Both Mary Payne and Angela Hull testified that they had been threatened with harm, by persons unknown to them, if they testified in the case.

-5-

At the conclusion of the state's case, the defense rested without offering proof. Based on the evidence, the jury returned a verdict finding the defendant guilty of second degree murder as a lesser-included offense of premeditated first degree murder.

## I. Sufficiency of the Evidence[2]

The defendant complains that the state failed to prove beyond a reasonable doubt that he was guilty of second degree murder. We must disagree.

When an accused challenges the sufficiency of the evidence, an appellate court surveys the evidentiary landscape, including its direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational factfinder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the evidence, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court is not an appellate surrogate for the trier of fact.

Second degree murder is "[a] knowing killing of another," punishable as a Class A felony. Tenn. Code Ann. § 39-13-210 (1997). Visualizing the evidence in this case most favorably to the state, we conclude that the proof sufficiently supports the defendant's conviction for second degree murder. The defendant's argument on the evidence sufficiency is an attack on the credibility of Mary Payne, the only witness who identified "Milk" as the shooter.

At trial, the defense aggressively pursued a strategy designed to portray Mary Payne a/k/a Carolyn Pope as an unsavory character with mendacious qualities. This witness provided an opportunity for the defense to travel most of the traditional avenues for witness impeachment: prior felony convictions, impairment of perception by drug usage, prior inconsistent statements, and prior instances of dishonesty and lying to law enforcement. The prosecution's case was subjected to meaningful and probing adversarial testing, and the jury was able to weigh all of the circumstances and reach its own conclusion about Mary Payne's credibility. We cannot substitute our judgment.

The defendant's sufficiency claim fails.

---

[2] Our discussion of the issues in this opinion is in a slightly different order than presented in the parties' briefs.

## II.  Failure to Order Pretrial Production of *Jencks* Act Material

The defendant, on appeal, asks this court to declare that Criminal Procedure Rule 26.2 is unconstitutional because witness statements should be provided prior to trial instead of after the witness testifies.[3]  The defendant identifies no witness statements from his trial that are involved in this issue, nor does he point to any resulting prejudice that he sustained.  He generically invokes the Sixth and Fourteenth Amendments to the United States Constitution, but he fails to cite any authority that has interpreted these Amendments as he suggests.  This issue has been waived.  Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10(b).

At any rate, our supreme court previously has ruled that there is "no constitutional requirement that the State provide witnesses' statements prior to trial." *State v. Taylor*, 771 S.W.2d 387, 394 (Tenn. 1989) (no requirement under Rule 26.2, even in capital cases).  "The rule," the supreme court declared, "is clear that the State has no obligation to produce statements of a witness until the conclusion of the witness' testimony on direct examination." *Id.*

## III.  Discovery of Police Reports

---

[3] Rule 26.2 provides in pertinent part,

> After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.
>
> . . .
>
> . . . Upon delivery of the statement to the moving party, the court, upon application of that party, may recess proceedings in the trial for the examination of such statement and for preparation for its use in the trial.

Tenn. R. Crim. P. 26.2(a), (d).

In his brief, the defendant mounts another constitutional challenge. This one is aimed at Criminal Procedure Rule 16, governing discovery in criminal cases. Tenn. R. Crim. P. 16. The defendant's argument is two-fold. First, he argues that Rule 16(a)(2) is unconstitutional because it prohibits the defense from obtaining discovery of police reports in the state's possession in violation of his due process rights and his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Second, he attacks Rule 16 on the basis that not allowing a party complete access to materials, as in a civil case, violates due process and the Sixth and Fourteenth Amendments to the United States Constitution.

The defendant does not identify any particular police report at issue, and the record does not contain any sealed reports for appellate review. The defendant, moreover, fails to specify how he was prejudiced by being denied access to any such reports. This issue is waived. Tenn. R. Crim. P. 27; Tenn. Ct. Crim. App. R. 10(b).

At any rate, Rule 16 "is not the exclusive procedure for obtaining discovery." Tenn. R. Crim. P. 16 Advisory Comm'n Comments. For instance, "discovery required by due process is not expressly structured into the rule." *Id.* The prosecution's duty to disclose exculpatory evidence does not depend on Rule 16 for its existence or continued vitality. S*ee Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). The defendant posits as a general proposition that police reports contain potentially exculpatory information, but such speculation does not rise to a level that requires automatic disclosure of all police reports. *See*, *e.g.*, *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995) (four prerequisites to establish *Brady* violation; the key is to show that omitted evidence is of such significance to deny right to fair trial).

This issue must fail.

## IV. Release of Arrest Histories

In his next issue, the defendant asserts that the trial court committed error in denying his request that the state be required to furnish him with the arrest histories of state witnesses. The defendant claims that he is entitled to the information pursuant to Code section 40-32-101(c)(3), which provides, "Release of arrest histories of a defendant or potential witness in a criminal proceeding to an attorney of record in the proceeding shall be made to such attorney upon request." Tenn. Code Ann. § 40-32-101(c)(3) (Supp. 2000).

This claim is not novel. Each time it has been considered, the ruling has been the same. Neither Criminal Procedure Rule 16 nor the decisional law in this state imposes on the state a duty *to obtain and provide* the arrest histories of its witnesses. *See State v. Workman*, 667 S.W.2d 44, 51 (Tenn. 1984); *State v. Baker*, 623 S.W.2d 132, 133 (Tenn. Crim. App. 1981). Moreover, it has been settled that section 40-32-101(c)(3) does not create or provide a pretrial remedy for the discovery of arrest histories from the state. *State v. Burton*, 751 S.W.2d 440, 448-49 (Tenn. Crim. App. 1988).

This is not to say that the state has no other obligation regarding arrest histories. Pursuant to *Brady v. Maryland* and it progeny, the state has a constitutional obligation to provide an accused with exculpatory evidence. Exculpatory evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). Even so, the defendant has made no attempt in this case to demonstrate that the state suppressed any favorable or material evidence.

The trial court did not improperly decline to order that the state turn over the requested arrest histories.

## V. Impeaching Convictions

The defendant also alleges as error that the trial court erroneously ruled that if he chose to testify, his prior convictions for second degree burglary, grand larceny, attempted robbery, and robbery would be admissible to impeach his credibility. Following this ruling, the defendant did not take the stand.

Subject to certain conditions for admissibility, Tennessee Evidence Rule 609 authorizes the use of proof of a witness's prior convictions in order to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). To be eligible as an impeaching conviction, a prior felony conviction need not involve dishonesty. When the witness to be impeached is the criminal defendant, however, the state must give notice prior to trial of its intent to utilize the conviction for impeachment purposes, Tenn. R. Evid. 609(a)(3), and upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." *Id.* In making this determination, "two criteria are especially relevant." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [the relevance] on the record," *id.*, and second, it must "assess the similarity between the crime on trial and the crime underlying the impeaching conviction," *id.* (quoting Cohen, *et al.*, Tennessee Law of Evidence § 6.09 [10] [c], at 6-97 to -99 (4th ed. 2000)).

In this case, the balancing of probative value and unfair prejudicial effect is the issue; that is, whether the probative value of the defendant's burglary, robbery, and larceny convictions on the defendant's credibility outweighed its prejudicial effect upon the substantive issues presented at trial. The defendant complains that his prior convictions, particularly those for robbery, would be prejudicial considering that he was on trial for felony murder with robbery being the underlying felony.

On appellate review, the trial court's ruling on the admissibility of prior convictions for impeachment purposes is subject to reversal only for abuse of discretion. *See, e.g.*, *Mixon*, 983 at 674.

The trial court in this case conducted a jury-out hearing and thoughtfully considered the admissibility of the prior convictions. The trial court took into account whether the prior convictions were similar to the offense being prosecuted, whether the prior convictions involved crimes of dishonesty, which would be particularly relevant to the defendant's credibility if he testified, and whether the jury might brand the defendant as having a propensity to commit robberies. The trial court concluded that the probative value of the convictions, particularly those for robbery, was great and directly relevant to the defendant's credibility. More so than the burglary and grand larceny convictions, which occurred in 1989, the trial court found that the more recent robbery convictions were particularly relevant to whether or not the defendant was honest. The trial court also observed that any prejudice would be alleviated somewhat because the jury would receive a curative instruction.

The trial court correctly analyzed and applied the rules and pertinent decisional law, and it conscientiously weighed prejudicial effect against probative value. We cannot say, under these conditions, that the trial court abused its discretion in this case in allowing evidence of the defendant's convictions involving burglary, larceny, and robbery, all of which are highly probative of credibility. *See State v. Crank*, 721 S.W.2d 264, 266 (Tenn. Crim. App. 1986) (offense of robbery is "highly probative on the credibility question" because it involves dishonesty); *State v. Goad*, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985); *State v. Stafford*, 670 S.W.2d 243, 245 (Tenn. Crim. App. 1984).

We, therefore, affirm the trial court's ruling.

## VI. Double Jeopardy Violation and Amendment of Charges after Mistrial

### a. Double Jeopardy

The issue that the defendant presses most insistently is that the Tennessee and United States constitutional provisions against double jeopardy barred retrial, after his first trial ended in a mistrial because of improper prosecutorial questioning of witness Mary Payne a/k/a/ Carolyn Pope. This double jeopardy flag of prosecutorially provoked mistrials is frequently raised but rarely saluted. This case is no exception.

The double jeopardy clause of the Fifth Amendment protects defendants from repeated prosecutions or multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969), *overruled in part by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201 (1989); *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). As a component of this constitutional protection, an accused has the right "to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 837 (1949). Nevertheless, the protection is not absolute in the sense of guaranteeing the enforcement of the criminal laws in one proceeding. *See Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S. Ct. 2083, 2087-88 (1982). That is, double jeopardy principles do "not go so far as to compel society to so mobilize its decision making resources that it will be prepared to assure the defendant a single proceeding free from

harmful governmental or judicial error." *United States v. Jorn*, 400 U.S. 470, 484, 91 S. Ct. 547, 556 (1971). Trial errors, in other words, are addressed through a defendant's right to appeal, not the double jeopardy clause. *See Beringer v. Sheahan*, 934 F.2d 110, 113 (7th Cir.), *cert. denied*, 502 U.S. 106, 112 S. Ct. 641 (1991). That distinction, as we shall explain, is pivotal and determinative in nearly all cases involving defense-requested mistrials based on prosecutorial overreaching.

Considering the interests sought to be protected by the double jeopardy clause, it logically follows that if a defendant requests a mistrial, he gives up the right to a verdict by the empaneled jury. Double jeopardy, it is recognized, does not bar a retrial in that situation. *See United States v. Dinitz*, 424 U.S. 600, 96 S. Ct. 1075 (1976). An exception to this general rule exists, however, in the very limited context wherein prosecutorial misconduct supplies grounds for a defense motion for mistrial, and the misconduct "was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679, 102 S. Ct. at 2091.

The contours of this exception have been honed over time. In *United States v. Dinitz*, the United States Supreme Court announced that the double jeopardy clause protects an accused "against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions." *Dinitz*, 424 U.S. at 611, 96 S. Ct. at 1081. The Supreme Court then added, however, that retrials are barred when "'bad-faith conduct by judge or prosecutor' . . . threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Id*., 96 S. Ct. at 1081 (citations omitted).

Subsequently, in *Oregon v. Kennedy*, the "bad-faith conduct" language in *Dinitz* was reworked so as to pare down the type of prosecutorial overreaching that will bar a retrial. Henceforth, "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 675, 102 S. Ct. at 2089. This standard "merely calls for the court to make a finding of fact." *Id*. To emphasize the point, the Supreme Court stated,

> We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

*Id*. at 678, 102 S. Ct. at 2091.

The import of *Oregon v. Kennedy* was aptly summarized in *United States v. Jozwiak*, 954 F.2d 458 (7th Cir.), *cert. denied*, 503 U.S. 950, 112 S. Ct. 1512 (1992). "*Kennedy* distinguishes intent to improve the chance that the trier of fact will return a favorable decision from the forbidden intent to avoid a decision by the trier of fact." *Id.* at 460. Stated more bluntly, "The double jeopardy clause serves not to punish prosecutorial misconduct; it simply ensures that the defendant, not the government, gets to choose whether to go to verdict." *Beringer*, 934 F.2d at 113.

Pursuant to *Oregon v. Kennedy*, the requisite prosecutorial intent necessary to trigger double jeopardy protections is quite specific. One of the better discussions regarding such intent appears in *West v. State*, 451 A.2d 1228 (Md. Ct. Spec. App. 1982).

> When we speak of intentional misconduct, we are not speaking of a mere general intent to do the act. Absent the rare case of the Freudian slip or the muscular spasm, the prosecutor always intends (1) to ask the question, that turns out to have been erroneous; (2) to make the argument, that turns out to have been inflammatory; and (3) to introduce the evidence, that turns out to have been inadmissible. The double jeopardy law contemplates some specific intent to achieve a desired purpose above and beyond the mere general intent to do the erroneous act.

*Id.* at 1234.

The *West* opinion then identifies five possible "specific intents."

> 1. thinking it to be correct;
>
> 2. not thinking about whether it is error or not (perhaps lawyerly negligence);
>
> 3. being cavalierly indifferent to error under circumstances where one would reasonably be expected to know that there is probably error (perhaps gross negligence);
>
> 4. knowing it to be error, but hoping to get away with it, thereby clinching a probable winner (deliberate "overkill" in a case the prosecutor has no desire to abort);
>
> 5. knowing it to be error, but desiring to "sabotage" a probable loser either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the probable acquittal and living to fight again another day.

*Id*. at 1235. Under *Oregon v. Kennedy*, only the fifth example is sufficient to preclude a retrial. *Id*. Recourse for misconduct under the other four examples is achieved by way of appellate review leading to reversal of the conviction and a new trial. *See id.* Viewed in this fashion, relief *on a claim of double jeopardy* grounded in prosecutorial misconduct seldom will be appropriate.

The standard set forth in *Oregon v. Kennedy* has been adopted in Tennessee and is controlling in this case. *See State v. Tucker*, 728 S.W.2d 27, 32 (Tenn. Crim. App. 1986); *State v. Nixon*, 669 S.W.2d 679, 681 (Tenn. Crim. App. 1983). On appellate review, the trial court's findings relative to prosecutorial intent, like other factual findings, are afforded the weight of a jury verdict, and those findings are conclusive on appeal unless the evidence clearly preponderates against them. *See Tucker*, 728 S.W.2d at 32.

In the defendant's case, the trial court issued a written order explaining why a mistrial was necessary. The order further stated that "the mistake made by the Assistant District Attorney for the State was an innocent one, and that her conduct was not intended to provoke the defendant into moving for a mistrial." No supporting facts were mentioned in the written order, but while the jury was deliberating during the defendant's second trial, the trial court fleshed out its observations and reasoning in greater detail, among which appear the following:

> On the day in question – this was Ms. Mosley's first murder trial. She had not ever tried a jury case and when she was assigned to my court last year and was being trained by Mr. Kitchen in this murder trial – Mr. Kitchen is the division leader – and he sat in with her just as he is during the trial of the case this week. Took no participation in it other than maybe helping with objections. And he sat there. . . .
>
> . . . So Ms. Aluko, then, on July the 7th, started impeaching Ms. Payne with this statement and took a question out of context – which is in some ways a proper strategic cross-examination – and basically cut Ms. Payne off as to an answer she gave in the question. Then, I watched, as sitting here, watched as Mr. Kitchen was explaining to Ms. Mosley that she could use her statement, a prior consistent statement, get back up on redirect and rehabilitate. And he handed her a statement and I saw him pointing. Ms. Mosley, then, got up and I had a copy of the statement that I entered as Exhibit A that day – Ms. Mosley got up and started reading, because Ms. Payne had been impeached about whether or not she actually knew this person that she knew as Milk, M-I-L-K. . . . Well, Ms. Mosley – Mr. Kitchen wanted Ms. Mosley to say, Do you know the suspect? Answer: he lives in the neighborhood. But instead, Ms. Mosley continued to read, "Question: Do you know the suspect?" "Answer: He lives in the neighborhood and he just got out of jail. He's always

going around and robbing people." Now as soon as Ms. Mosley said, "And he just got out of jail..." that got my attention. And I looked up, because I thought we were in trouble at that point. And as she started to read, "He's always going around and robbing people" Mr. Kitchen actually got out of his seat and attempted to grab the statement away from her. If this had been on Law and Order or some kind of courtroom show, it would have been comical because every now and then young prosecutors get in these kind of predicaments where there are things – where they are told by the division leader, they're told by the more experienced person to do something and they do it and keep doing it. . . .

Ms. Mosley then, to my mind, with the look on her face when I said, I think we're going to have to – Ms. Mosley had no clue as to what had gone on and was absolutely innocent of this. And it was just – it was an incident that was unfortunate but had absolutely no vindictiveness, no calculation, there was no plot to try to abort this trial because things weren't going well.

These findings are thorough and based on the trial court's first-hand observations and impressions. They are clearly sufficient to affirm the trial court's ruling that a retrial was not barred by double jeopardy principles. The defense did not object to or disagree with the trial court's account. The trial court and defense counsel did quibble about how many jury trials Ms. Mosley had or had not handled before the defendant's first trial, but there was no dispute – as the trial court put it – that "with no offense to Ms. Mosley, [she was] low on the totem pole in the D.A.'s office." Moreover, even if she or the division leader was pursuing some improper tactical advantage, double jeopardy principles still would not foreclose a retrial unless the intent to provoke a mistrial could be shown.

The record in this case does not contain any telltale signs that the state wanted to or needed to goad the defense into requesting a mistrial. The record demonstrates that, with the exception of proving the victim's cause of death, at the time of the mistrial the state had presented a case that would support a conviction. Nothing suggests that a necessary witness had failed to appear or had recanted or that the state had somehow failed to produce evidence needed to support an element of the charged offense. The record also does not disclose a pattern of prosecutorial error. Mary Payne's testimony and credibility were, no doubt, problematic for the state, but the state had to have been aware going into the first trial that the defense would feast on this witness during cross examination.

By concluding that double jeopardy did not bar the defendant's retrial, we are not winking at the improper and prejudicial events that occurred during the defendant's first trial.[4] The trial court quickly and accurately sized up the situation as requiring that the case be mistried. Even if, however, the trial court had not declared a mistrial, an appeal to this court following a conviction would have remedied that harmful error.

Concluding that the evidence does not preponderate against the trial court's findings that the state was not attempting to goad the defendant into seeking a mistrial, we affirm the trial court's order permitting the retrial to proceed.

### b. Amendment of Charges after Retrial

In addition to his double jeopardy complaint, the defendant also maintains that the state's reindictment and retrial of him for first degree murder, following the mistrial, violated due process through vindictive prosecution and violated Criminal Procedure Rules 7 and 8(a) dealing with amendment of indictments and mandatory joinder.

We are at a loss to see how the defendant was prejudiced by the state's post-mistrial attempt to enter into a plea agreement with the defendant, even though it leveraged the plea offer by a threat to indict and try the defendant for first degree murder, by the state's superseding indictment for first degree murder, or by placing the defendant on trial on this later indictment. The alleged vindictiveness resulted in no conviction of an offense greater than the offense originally charged, and the defendant did not accept the offered plea agreement and thus is not aggrieved by an involuntary guilty plea. In short, if the state were shown to be vindictive or if the trial court erred in putting the

---

[4] On the prejudice scale, it is difficult to say whether the error in this case or the one in *Oregon v. Kennedy* was more harmful. In *Oregon v. Kennedy*, the trial court had frustrated the efforts of prosecution counsel to elicit on redirect examination why its witness had filed, but not pursued, a criminal complaint against the defendant. When that line of inquiry failed, the prosecution settled on the following questions:

> [Prosecutor]: Have you ever done business with the Kennedys?
>
> [Witness]: No, I have not.
>
> [Prosecutor]: Is that because he is a crook?

456 U.S. at 669, 102 S. Ct. at 2086. The trial court then granted Kennedy's motion for a mistrial.

-15-

defendant to trial on the superseding indictment, we would be constrained to conclude that any errors were harmless. Nevertheless, the claims of error raise interesting and rarely addressed points of law, and we will briefly consider them.

Regarding vindictive prosecution, we view this case to be controlled by *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S. Ct. 663 (1978). The prosecutor in that case offered a plea agreement and advised the defendant that if he did not plead guilty, the state would seek an indictment under the Kentucky Habitual Criminal Act; the Act would subject the defendant to a mandatory life sentence due to two prior felony convictions. The defendant rejected the plea agreement and was subsequently indicted and convicted under the Act. In that situation, the United States Supreme Court ruled that a presumption of vindictiveness does not arise, and hence due process is not violated, when a prosecutor thereafter follows through with a threat made during plea negotiations to bring additional charges against a defendant if that defendant refuses to plead guilty. *Id.* at 364, 98 S. Ct. at 668-69. *Cf. Blackledge v. Perry*, 417 U.S. 26, 94 S. Ct. 2098 (1974).

The state in this case alerted the defense after the mistrial that it would be seeking an indictment for first degree murder. The state then offered, as it had done before, to allow the defendant to plead guilty to second degree murder with an agreed-upon sentence. The defendant declined the state's offer, and the state sought and obtained a two-count indictment charging first degree premeditated murder and felony murder. Moreover, during a separate hearing, the assistant district attorney general who tried the case testified about the circumstances leading to the subsequent indictment. At the time the original charge was brought, the state did not know about the robbery aspect of the homicide. It was not until two weeks before trial and while interviewing Mary Payne that the state discovered this information. Based on previous experience, the state did not believe that the trial court would continue the defendant's trial, so additional charges were not submitted to a grand jury. After the mistrial and after the defendant rejected the state's renewed overture of a plea bargain, new charges were sought and obtained. No presumption of prosecutorial vindictiveness arises from these facts, and no actual vindictiveness has been shown. *See State v. Phipps*, 959 S.W.2d 538, 546 (Tenn. 1997) (a rebuttable presumption of prosecutorial vindictiveness arises when there is "realistic likelihood" of prosecutorial retaliation).[5]

Nor do we find that the retrial upon the superseding indictment for first degree murder violated Tennessee Rules of Criminal Procedure 7 or 8. Rule 7 limits the state's power to amend

---

[5] We believe the applicable measure of vindictiveness is set forth in *Bordenkircher*, even though in that case the High Court reviewed prosecutorial charge increases that were made before any trial occurred. In *Blackledge*, we note that the court reviewed prosecutorial charge increases that occurred after a lower court trial and before a *de novo* retrial on appeal, a procedural pattern somewhat similar to the present case. The *Blackledge* court held that "due process of law requires that [the] potential for vindictiveness must not enter into North Carolina's two-tiered [, *de novo*-retrial] appellate process." *Blackledge*, 417 U.S. at 28, 94 S. Ct. at 2103. The prosecutor's action in obtaining a felony indictment in midstream between the lower-court bench trial and the appeal for *de novo* retrial, thereby increasing the charge from a misdemeanor to a felony, violated principles of due process. *Id.* at 28-29, 94 S. Ct. at 2103. We need not be concerned in the present case whether the superseding indictment obtained between a mistrial and a retrial more closely resembles the *Borderkircher* situation or the *Blackledge* situation. Neither case is based upon double jeopardy principles, and accordingly, we conclude that the presence or absence of a preceding, nullified trial is not determinative.

a charging instrument when jeopardy has attached or the amendment would allege an additional or different offense or would prejudice substantial rights of the defendant. Tenn. R. Crim. P. 7(b). However, in the present case, no actual amendment of the indictment occurred. Furthermore, Rule 7 amplifies the state constitutional provision which requires that criminal charges be brought by indictment, presentment or impeachment. Tenn. Const. art. 1, § 14; Tenn. R. Crim. P. 7 Advisory Comm'n Comments. The superseding indictment was rendered by the grand jury. Thus, we conclude that neither the spirit nor the letter of Rule 7 was violated.

Rule 8 mandates the joinder of "[t]wo or more offenses" in the same charging instrument when they are "based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official" at the time of obtaining the charging instrument. Unless the offenses are severed pursuant to Rule 14, trials of "multiple offenses falling within this subsection" are barred. *Id.* We do not believe that Rule 8 is implicated in the current case, because the state did not attempt to allege "multiple" offenses. It alleged a single offense of homicide. The first indictment merely alleged a lesser-included offense of the greatest offense alleged in the second indictment. The state did not attempt to allege a second offense, as would have been the case, for instance, had it attempted to allege the commission of robbery, the predicate offense that was suggested in the superseding indictment's charge of first degree felony murder. We see no mandatory joinder problem in the present case. *See State v. King*, 717 S.W.2d 306, 308 (Tenn. Crim. App. 1986) (Rule 8 violation recognized when offense alleged in succeeding indictment was based upon the same conduct described in the first indictment, but the later-charged offense was not a lesser-included offense of the offense charged in the first indictment.)

Thus, the defendant's claims of infirmity based upon the reindictment and retrial on that indictment are rejected.[6]

---

[6] The determination that a retrial after mistrial is not barred by double jeopardy principles may not provide double jeopardy clearance to effectively recharge the defendant with a greater offense via a superseding indictment that becomes the basis for retrial. Even though we have rejected the defendant's due process and rule-based attacks upon the use of the superseding indictment, in light of *State v. Harris*, 33 S.W.3d 767 (Tenn. 2000), we see the possibility of error, *based upon double jeopardy principles*, in the trial court's use of the superseding indictment as a basis for retrial. Although we will not review the matter for plain error for the reasons shown below, we believe the lower court and other trial courts could profit from being aware of the issue.

Generally, double jeopardy principles do not bar a retrial following a mistrial which results from jury impasse. *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824 (1978). As pointed out in part (a) of this section VI of this opinion, generally retrial also is not barred after a mistrial that emanates from trial error. Except in those situations when the prosecution commits the error in order to goad the defendant into seeking the mistrial, the defendant's request for a mistrial is a waiver of his or her right to have the trier of fact resolve the case, and double jeopardy principles pose no bar to retrial. *Lee v. United States*, 432 U.S. 30, 31-34, 97 S. Ct. 2141, 2146-47 (1977). Given that retrial is not generally barred in these situations, is the state free to recharge the defendant via a superseding indictment that it uses as the basis for retrial?

A superseding indictment is "an indictment obtained without the dismissal of a prior indictment." *Harris*, 33

(continued...)

-17-

[6] (...continued)
S.W.3d 771. The state enjoys the discretion to seek a superseding indictment when "there has been *no jeopardy* on the first indictment." *Id*. (emphasis added). Although the state may not use superseding indictments to "harass or intimidate" a defendant, it "may obtain a superseding indictment at any time *prior to trial* without dismissing the pending indictment and may then select the indictment under which to proceed to trial." *Id*. (emphasis added).

Based upon the language in *Harris*, the power of the state to supersede the indictment after a mistrial turns upon the meaning of the phrases "there has been no jeopardy" and "prior to trial." After a mistrial, has jeopardy already attached because it attached in the first trial? Or, has the slate been swept clean by the declaration of mistrial, such that for purposes of superseding indictments, the period between the mistrial and the retrial is a time when there is "no jeopardy," a time "prior to trial"?

Few cases have analyzed the recharging issue as a matter of double jeopardy, and this is probably because Tennessee Rule of Criminal Procedure 7 poses a significant obstacle to the state's right to amend the charging instrument once jeopardy attaches. Tenn. R. Crim. P. 7(b); *see* Advisory Comm'n Comments (the rule is a reflection of state constitutional concerns about the grand jury's approval of charges and not *per se* a reflection of double jeopardy principles). As such, Rule 7, the most convenient instrument for battling prosecution efforts to redefine the charged offense after the attachment of jeopardy, has largely preempted the field. Some courts have had the opportunity to address the double jeopardy aspects of midstream recharging but generally have declined to do so. For instance, in *Seiber v. State*, 542 S.W.2d 381 (Tenn. Crim. App. 1976), a bench trial of a misdemeanor in general sessions court was aborted after the attachment of jeopardy when the judge invoked an erstwhile provision that allowed binding the case to the grand jury when it appeared that a fine in excess of $50 would be appropriate. *Id*. at 383-84. The court held that double jeopardy principles *barred the retrial* in criminal court after grand jury indictment. The court, however, did not discuss the propriety of a post-attachment upgrading of the charge. *Id*. at 385. *See Lee v. United States*, 432 U.S. 26, 28-31, 97 S. Ct. 2141, 2144-46 (1977) (disruption of trial after attachment of jeopardy similar to *Seiber* analyzed as a mistrial problem).

On the other hand, in *United State v. Cerilli*, 558 F.2d 697 (3d Cir. 1977), a mistrial was declared upon the defendant's request after a juror became ill and was hospitalized. *Id*. at 698. Before retrial, the government obtained a superseding indictment which added "six additional substantive counts." *Id*. at 699. On appeal, the court held that the defendant's consent to the mistrial "remove[d] any [double jeopardy] barrier to a reprosecution, *whether under the original indictment or under a new one*." *Id*. at 702 (emphasis added). In *United States v. Corona*, 804 F.2d 1568 (11th Cir. 1986), a mistrial resulted from a hung jury. *Id*. at 1569. The government procured a superceding indictment which expanded some of the charges. *Id*. The *Corona* court upheld the lower court's denial of the defendant's motion to dismiss the superceding indictment. The court held that retrial on the superceding indictment was not barred by double jeopardy principles. *Id*. at 1570. Specifically, it found no constitutional bar to prosecuting the superceding indictment, even though it acknowledged that jeopardy had attached in, and continued beyond, the first trial. *Id*.

Other cases have spoken of the "clean slate" theory, by which retrial is permitted after a reversal on appeal because the conviction was "wholly nullified and the slate wiped clean." *State v. Harris*, 919 S.W.2d 323, 328 (Tenn. 1996) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 721, 89 S. Ct. 2072, 2078 (1969)). *See State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982) (state given a clean slate to reprosecute defendant in the aftermath of trial court determining, after jeopardy had attached, that the warrant on which the trial was based was void). These cases and *Cerilli* support an understanding of *Harris* that jeopardy somehow does not survive the declaration of a mistrial.

The "there has been no jeopardy" and "prior to trial" language in *Harris*, however, appears problematic when one considers *Richardson v. United States*, 468 U.S. 317, 104 S Ct. 3081 (1984), in which the High Court held that jeopardy, which attached for the purposes of the Fifth Amendment double jeopardy provision when the jury was selected and sworn, "continued" when the jury failed to reach a verdict and the case was mistried. *Id*. at 326, 104 S. Ct.

(continued...)

# VII. Jury Instructions

The defendant's claim that the jury should not have been instructed regarding sentencing matters, pursuant to Code section 40-35-201(b) (repealed 1998), is easily settled. That statute had required trial courts to instruct juries regarding parole and release eligibility when a jury instruction on the sentencing range was requested by either party.[7]

---

[6](...continued)
at 3086. If *Richardson* applies to a mistrial based on trial error and not just a hung jury, jeopardy attached when Johnson's first jury was sworn, and that jeopardy "continued" throughout his second trial. Arguably, this continuing of jeopardy means that, for purposes of utilizing a superseding indictment, the tardy bell had already rung when jeopardy attached in the first trial.

We need not determine which view of the attachment of jeopardy controlled the reindictment in the present case. In part (a) of this section VI, the defendant used double jeopardy principles to challenge his being retried, but not to challenge the use of the superseding indictment. In this part, he challenges the use of the superseding indictment, but not on double jeopardy grounds. Thus, any double jeopardy error in proceeding on the superseding indictment is a question of plain error. Any double jeopardy error in proceeding on the superseding indictment, however, was harmless beyond a reasonable doubt. The jury acquitted the defendant of first degree murder and convicted him of second degree murder, the highest grade of homicide charged in the first indictment. Because any error was harmless, it would not "affect the substantial rights" of the defendant, and we would decline to notice it as plain error. *See* Tenn. R. Crim. P. 52(b).

[7] That statute, since repealed, provided in pertinent part:

(b)(1) In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses.

(2)(A)(i) When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to

(continued...)

Although at one time a sharp split of authority existed concerning whether section 40-35-201(b), as applied, violated due process, the supreme court has settled the matter. Its rulings in *State v. King*, 973 S.W.2d 586 (Tenn. 1998), and *State v. Nichols*, 24 S.W.3d 297 (Tenn. 2000), are dispositive; in those cases the supreme court determined that instructing juries about sentencing and release eligibility percentages, either for the jury's "information only" or for the jury to "weigh and consider," does not result in constitutional error.

In connection with this issue, the defendant also argues in vague terms that the sentencing and release eligibility figures supplied to the jury were prejudicially inaccurate. He merely asserts that improper minimum and maximum sentences and low parole eligibility figures were used. The jury instructions given by the trial court have not been transcribed and are not before us; therefore, consideration of the defendant's assertion has been waived. It is the appellant's burden to prepare a record on appeal that presents a complete and accurate account of what transpired in the trial court with respect to the issue on appeal. Tenn. R. App. P. 24(b). The failure to do so results in a waiver of such issues. *See*, e.g., *Thompson v State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).

For the foregoing reasons, we reject this claim.

### VIII. Witness Impeachment

In his next issue, the defendant claims that the trial court committed error of constitutional dimension by refusing to permit him to cross examine state's witness Mary Payne about whether the same assistant district attorney general who was prosecuting his case also had been the affiant on a probation revocation warrant involving the witness, which later was dismissed. The defendant argues that his inability to show who the prosecutor was on the witness's probation revocation warrant denied him the ability to have the jury consider the entire picture concerning any

---

[7](...continued)

imprisonment for the offense charged and lesser included offenses must serve

before reaching such person's earliest release eligibility date. Such calculation shall

include such factors as the release eligibility percentage established by § 40-35-501,

maximum and minimum sentence reduction credits authorized by § 41-21-236 and

the governor's power to reduce prison overcrowding.

-20-

possible deal that may have occurred between the prosecutor and the witness. The defendant thus reasons that his constitutional confrontation rights were violated entitling him to a new trial.[8]

It is, of course, fundamental that an accused is entitled to show the jury that a witness has a bias, prejudice, or motive for testifying falsely. One way this showing can be made is to offer proof of a deal between the witness and the prosecution such that the witness would naturally be inclined to testify in a way favoring the state's case. *See, e.g.*, *State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *State v. Norris*, 684 S.W.2d 650, 654 (Tenn. Crim. App. 1984). We have no quarrel with this general principle or with constitutional confrontation interests that are advanced through such cross examination. *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431 (1986) (undue restriction of right to explore on cross examination promises of leniency to prosecution witness may violate a defendant's right to confrontation).

Even so, we fail to see how the identity of the prosecutor who swore out the probation revocation warrant might relate to any alleged deal between the witness and the prosecutor handing the defendant's case. In the defendant's case, the identity of the assistant district attorney general who dismissed the probation revocation warrant, and not the one who swore out the warrant, is the telling point – if there is one. Any deal with the witness, in other words, would not have concerned the taking out of the warrant but, instead, the reason that the warrant was dismissed, or, at the very least, the witness's belief why the warrant was dismissed. The witness in this case was asked by the defense and, in response, denied that any deal existed; the identity of the affiant on the warrant would not have contradicted that testimony. Moreover, the assistant district attorney general on the defendant's case stated, without contradiction, that she did not know why the probation revocation warrant was dismissed and did not participate in the hearing.

Without more, we are unable to grasp the logic of the defendant's argument, and we affirm the trial court's ruling.

## IX. Sentencing

In his final issue, the defendant complains that his 37-year sentence is excessive and should be reduced. We are unable to review this issue because the record before us is inadequate for the task.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the

_____

[8] The state argues on appeal that the defendant withdrew and abandoned his request to question the witness along these lines such that the issue has been waived. We are not persuaded that the record clearly shows a waiver.

appellant." *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo. Id.* If appellate review reflects that the trial court properly considered all relevant factors and that its findings of fact are adequately supported by the record, this court must affirm the sentence, even if our independent judgment on the question might differ. *See State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The judgment form in this case reflects that the defendant was sentenced as a Range II multiple offender to 37 years in the Department of Correction. This is a lawful sentence for a Range II offender convicted of second degree murder, a Class A felony. The defendant perceives his sentence to be excessive, and he asks that it be reduced because the trial court improperly weighed enhancement and mitigating factors.

We are unable to review the defendant's claim because the sentencing hearing was not transcribed and is not before us to review. That being the situation, the court must presume that the sentence imposed by the trial court is proper, and the court is bound by the determination of the trial court. The appellant has a well-settled obligation to prepare and furnish a record that includes those proceedings relevant to the issue being appealed; otherwise the issue has waived. *See State v.* Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987); *State v. Hoosier*, 631 S.W.2d 474, 476 (Tenn. Crim. App. 1982).

The defendant's failure to present us with an adequate record precludes review of this issue, and we affirm the sentence imposed by the trial court.

## Conclusion

The defendant waged an aggressive defense in this case – one that meaningfully subjected the prosecution's case to the crucible of adversarial testing. We are unpersuaded of error in the proceedings below, and we therefore affirm the judgment and sentence of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE